IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | CRIMINAL ACTION |
| v. : | |
| : | NO. 03-173-04 |
| RAYMOND JACKSON : | |

**SURRICK, J.**                                                                                          **MARCH 16, 2009**

### MEMORANDUM & ORDER

After a hearing in open court and upon consideration of reports submitted by the psychologists and psychiatrist who have evaluated Defendant Raymond Jackson, we find that Raymond Jackson is not competent to stand trial. We further find by clear and convincing evidence that Raymond Jackson presently suffers from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to himself or another person. Accordingly, we will commit Raymond Jackson to the custody of the Attorney General pursuant to 18 U.S.C. § 4246(d).

**I.    BACKGROUND**

This case has had a long and unusual procedural history. On March 19, 2003, Defendant was indicted on charges of conspiracy to distribute cocaine base ("crack") in violation of 21 U.S.C. § 846 (Count One); possession of cocaine base ("crack") with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) (Count Seven); and possession of cocaine base ("crack") with intent to distribute within 1000 feet of a school, in violation of 21 U.S.C. § 860(a) (Count Eight). (Doc. No. 1.) Shortly after the Indictment, concerns were raised about Defendant's mental health

and Defense counsel was authorized to employ Dr. Elliot Atkins to perform a forensic psychological evaluation of Defendant. (Doc. No. 87.) As a result of the examination of Defendant at the Federal Detention Center in Philadelphia ("FDC"), Dr. Atkins concluded that Defendant was suffering from a psychotic disorder and was not competent to stand trial. (Doc. No. 243, Ex. A (Atkins Letter of Jan. 12, 2004).) On February 19, 2004, we entered an Order directing that Defendant be committed to the custody of the Attorney General to be hospitalized for evaluation and treatment pursuant to 18 U.S.C. § 4241(d). (Doc. No. 118.) Defendant was evaluated and treated at the United States Medical Center for Federal Prisoners in Springfield, Missouri, from April 8, 2004, until July 14, 2004. On July 14, 2004, Mark Carter, Ph.D., a staff psychologist at that facility, submitted a report in which he concluded that Defendant met the diagnostic criterion for adjustment disorder with mixed disturbance of emotions and conduct, and antisocial personality disorder, but that he was competent to stand trial. (Carter Report at 10.)

On August 23, 2004, an Order was entered declaring Defendant competent to proceed to trial. (Doc. No. 196.) The following day, Defense counsel filed a Motion to Reconsider the August 23, 2004 Order (Doc. No. 197), asserting that Dr. Atkins remained convinced that Defendant was not competent. (*Id.*, Ex. A.)

A hearing was held on the Motion to Reconsider on September 17, 2004. (Doc. No. 205.) We subsequently vacated the Order of August 23, 2004, and directed that Defendant undergo an independent psychiatric evaluation by Dr. Pogos H. Voskanian (General and Forensic Psychiatry) to assist in the competency determination. (Doc. No. 222.) Dr. Voskanian examined Defendant on February 2, 2005, and found him to be competent. (Doc. No. 238.) Dr. Atkins reexamined Defendant and concluded that he was not competent. (*Id.*) A hearing was held on July 14, 2005,

for the purpose of taking the testimony of Dr. Voskanian, Dr. Carter, Dr. Atkins, and Dr. Ira Kedson, a forensic psychologist at the FDC. (*Id*.) On October 7, 2005, we again found Defendant competent to stand trial, concluding that Defendant's conduct was volitional. (Doc. No. 250.)

Trial was scheduled for November 14, 2005. (*See* Doc. No. 249.) On October 27, 2005, we held a hearing, with Defendant and counsel present, on Defendant's request to proceed *pro se* at trial. (*See* Doc. No. 252.) Defendant repeatedly interrupted the proceedings. (*See* Hr'g Tr. Oct. 27, 2005.) The hearing was ultimately concluded when Defendant reached into his pants with his hand, pulled his hand out of his pants, and began to eat his own feces. (*Id*.)[1] Based upon this bizarre behavior, Dr. Voskanian was again asked to conduct a psychiatric assessment of Defendant. (Doc. No. 253.) Dr. Voskanian submitted a Competency to Stand Trial Evaluation on November 6, 2005 ("Voskanian Evaluation"). Dr. Voskanian found:

> Mr. Jackson did not cooperate with either the formal mental status examination or the competency to stand trial evaluation. The defendant had displayed non-hygienic and disruptive behaviors. He had been noncompliant with his medications. The defendant has been assessed as a malingerer in the past. While some of his behaviors could be conscious and manipulative, the defendant has regressed and has difficulty tolerating the stress of his trial. . . .

(Voskanian Evaluation at 2.) Dr. Voskanian recommended transferring Defendant to a psychiatric facility for behavioral management and observation. (*Id.* at 11.)

Counsel for Defendant filed a Motion for Continuance of the trial (Doc. No. 258) and on November 10, 2005, we entered an Order continuing the trial pursuant to 18 U.S.C. §

---

[1] Defendant reported to his attorney around this time that he was being denied medication. (*See* Hr'g Tr. Oct. 27, 2005, at 9.) In fact, Defendant was refusing to take his medication. (*Id*.)

3

3161(h)(8)(A) [now § 3161(h)(7)(A)].  (Doc. No. 259.)  The Government was directed to provide Defense counsel with all available medical records related to Defendant and a competency hearing was scheduled for January 25, 2006.  (Doc. Nos. 262, 266.)  At the competency hearing, we determined that Defendant was not competent to stand trial and ordered that he be committed to the custody of the Attorney General to be hospitalized for treatment pursuant to 18 U.S.C. §§ 4241(d)(1) and (2).  (Doc. No. 173.)  Counsel for the Government and counsel for Defendant agreed with this determination.  (Doc. No. 272.)  Defendant was transferred to the United States Medical Center at Springfield, Missouri.  Defendant arrived at that facility on February 16, 2006, and remained there until July 18, 2007, at which time he was returned to the FDC in Philadelphia.  He arrived in Philadelphia on July 23, 2007.

After Defendant's return from Springfield, Missouri, we received the following reports and letters regarding Defendant's mental health:  (1) Forensic Report dated January 16, 2008, from Dr. James K. Wolfson, staff psychiatrist at the United States Medical Center for Federal Prisoners in Springfield, Missouri ("Wolfson Report"); (2) Certificate of Competency accompanying the Wolfson Report; (3) Letter from Defense counsel, Arthur Donato, Jr., Esq., dated February 1, 2008 ("Donato Letter of Feb. 1, 2008"); (4) Letter dated March 5, 2008, from Dr. Atkins ("Atkins Letter of Mar. 5, 2008") submitted in response to the Wolfson Report; (5) Letter dated September 26, 2008 from Dr. Andrea Boardman, chief psychologist at the FDC ("Boardman Letter"); (6) Letter from Donato dated October 7, 2008 ("Donato Letter of Oct. 7, 2008"); (7) Letter from Dr. Atkins dated October 6, 2008 ("Atkins Letter of Oct. 6, 2008") submitted in response to the Boardman Letter; (9) Letter from Dr. Atkins dated November 7, 2008 ("Atkins Letter of Nov. 7, 2008").

Based upon these reports and letters and after hearing on November 26, 2008, we determined that Defendant should be committed to the custody of the Attorney General pursuant to 18 U.S.C. § 4246(d).[2]

## II.   LEGAL STANDARD

The civil commitment process is governed by 18 U.S.C. § 4246.  Section 4246(c) provides that the Court shall conduct a hearing on the matter.  *Id.* § 4246(c).  Section 4246(d) provides that

> [i]f, after the hearing, the court finds by clear and convincing evidence that the person is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another, the court shall commit the person to the custody of the Attorney General. The Attorney General shall release the person to the appropriate official of the State in which the person is domiciled or was tried if such State will assume responsibility for his custody, care, and treatment. The Attorney General shall make all reasonable efforts to cause such a State to assume such responsibility. . . .

*Id.* § 4246(d).  However, several courts have recognized that § 4246 contains "troubling gaps in the statutory scheme."  *United States v. Bonin*, No. 07-0023, 2007 U.S. Dist. LEXIS 39127, at *19 n.6 (W.D. La. May 30, 2007) (*citing United States v. Shawar*, 865 F.2d 856, 863 (7th Cir. 1989), *vacated and remanded*, 541 F.3d 399 (2008); *United States v. Wheeler*, 744 F. Supp. 633, 636 (E.D. Pa. 1990)).  In *Bonin*, the court recognized that

> the statutory scheme does not expressly set forth a procedure to follow when an incompetent defendant, who lacks a 'substantial probability' of attaining competence through additional hospitalization, is no longer in the custody of a federal medical facility, and hence no certificate addressing the defendant's dangerousness as contemplated by § 4246(a) may be filed by that facility.

---

[2] Counsel agreed that the reports and letters could be offered into evidence and that it was not necessary to call Dr. Carter, Dr. Atkins, Dr. Wolfson, Dr. Boardman, or Dr. Voskanian to testify.

2007 U.S. Dist. LEXIS 39127, at *26-27.  When faced with a similar situation, the court in *Wheeler* concluded "that this court has an obligation to make a determination as to whether defendant's release is likely to create a substantial risk of danger to society."  *Wheeler*, 744 F. Supp. at 639.  The court went on to determine that, "[b]ecause of the black hole of legislation in which I find this court," the most prudent course would be to determine whether the defendant is competent to proceed to trial under § 4241(d) and, if not, to determine whether the defendant's release would create a substantial risk of bodily injury to another person or damage to property pursuant to § 4246(d).  *Wheeler*, 744 F. Supp. at 639.

### III. DISCUSSION

#### A. Conclusions of Mental Health Professionals

##### 1. Dr. Voskanian

Dr. Voskanian examined Defendant at the FDC on November 1, 2005, after his feces-eating episode in open court.  (*See* Voskanian Evaluation at 1-3.)  Dr. Voskanian described how Defendant defended his consumption of his feces and urine with the explanation that it was healthy and protected him against disease.  (*Id*. at 3-4.)  Defendant also espoused various conspiracy theories:  Defendant's arrest and imprisonment represent a kidnapping because "these people" want to cash in on his birth certificate; people are putting AIDS into vending machines to kill African-Americans; people steal his urine to clone him; people steal melanin from African-Americans so that they can stay out in the sun longer.  (*Id*.)  Upon questioning, Defendant reported hearing voices but did not wish to discuss the issue.  (*Id*. at 6.)  Dr. Voskanian noted that Defendant had a history of management problems:  "'[Defendant] reported periodic agitation and difficulty controlling his temper when people do things that upset him.

Staff have reported that [Defendant] has lately been a management problem, becoming unrealistically upset when he feels slighted by anyone, becoming agitated, and acting out behaviorally (e.g., covering SHU cell window, refusing to come out of the cell when asked, etc.).'" (*Id*. at 9 (*quoting* from October 2004 progress notes).)  Defendant also made threatening comments to staff at the medical facility.  (*Id*.)  Defendant's doctors noted that during some consultations he appeared agitated and yelled at the doctors.  (*Id*.)  In addition, Dr. Voskanian noted that Defendant had "a well-documented history of noncompliance with medication."  (*Id*. at 10.)  Ultimately, however, Dr. Voskanian believed that Defendant was manipulating the system in order to disrupt court proceedings.  (*Id*.)  Dr. Voskanian concluded that Defendant "would undoubtedly go to any length to manipulate and continue to play his 'game.'"  (*Id*. at 11-12.)

        2.    Dr. Wolfson

Dr. Wolfson observed Defendant during his stay at the Federal Medical Center in Springfield, Missouri, from February 16, 2006, to July 18, 2007.  (Wolfson Report at 1.)  Dr. Wolfson's Forensic Report details Defendant's sometimes erratic behavior, which Dr. Wolfson concluded was the result both of malingering as well as legitimate psychosis.  Dr. Wolfson found that conversing with Defendant was difficult because he "consistently divert[ed] the flow of interviews to other topics, such that extracting even basic background information from him was exceedingly time-consuming."  (*Id*. at 3.)  For example, Dr. Wolfson described how "[d]uring a ninety-minute interview in mid-April, he did share a lengthy exposition about a worldwide conspiracy by the illuminate (which he pronounced as 'Luminati'), which had various dimensions involving secret societies, the Vatican, the United Nations, the Rothschild and

7

Rockefeller families, and the federal government." (*Id*. at 6.) Defendant also discussed the Uniform Commercial Code, under which Defendant insisted that his name was copyrighted. (*Id*.) Dr. Wolfson stated that such conspiracy theories are not unusual with patients at the facility. (*Id*.) However, Dr. Wolfson went on to say:

> One aspect of the defendant's exposition that I considered noteworthy was that, notwithstanding that I had heard nearly all of these ideas before, he shared them with impressive intensity, not slackening even as the interview wore on. This is perhaps more suggestive of true mental illness than with others I have heard cover the same ground, though it could also be interpreted as indicating that the defendant simply had a better command of his material.

(*Id*. at 6-7.) Defendant provided some writings to Dr. Wolfson, and Defense counsel provided more, in which Defendant expounded on his conspiracy theories. (*Id*. at 11.) Dr. Wolfson observed that Defendant's "writings about this are expressed in a gang vernacular that bears no resemblance whatsoever to the way the defendant spoke to me [Dr. Wolfson] or anyone else at the facility." (*Id*.) Defendant's behavior rendered "impractical [Dr. Wolfson's] usual approach of questioning defendants" about their basic legal knowledge. (*Id*. at 10.) Defendant insisted that he did not consent to the Court's jurisdiction over him or to the charges against him. (*Id*. at 10-11.)

In particular, Dr. Wolfson noted that Defendant had significant difficulty speaking with his attorney, Arthur Donato, Jr., Esq. (*Id*. at 7.) Dr. Wolfson listened to a telephone conversation between Defendant and Donato and explained: "I was impressed by how intensely argumentative the defendant rapidly became with his lawyer, in the absence of anything I could identify as any kind of provocation. While we meet plenty of defendants who don't like their attorneys, there was an irrational flavor to the conversation that went beyond the usual friction

8

and gripes we observe." (*Id*.)

Defendant told Dr. Wolfson that he routinely eats his own feces and drinks his own urine, and that he did so at the direction of a woman's voice, "Inga." (*Id*. at 3.) Dr. Wolfson noted that Defendant had not been observed engaging in this behavior, except for at the hearing before this Court. (*Id*. at 4.) However, Defendant told Dr. Atkins that he hangs a towel over the window in his door when he ingests his feces. (Atkins Letter of Mar. 5, 2008 at 5.) Dr. Voskanian's Evaluation confirms that Defendant covered his cell window at times. (Voskanian Evaluation at 9.)

When Defendant faced the possibility of sharing a cell with another patient, he became very angry and threatened to become violent. (Wolfson Report at 5.) Defendant postured angrily to several people and told Dr. Wolfson that he "'doesn't do cellmates'" and that he "'has been known to cut people'" who were celled with him. (*Id*.) Dr. Wolfson agreed to house Defendant in a locked unit, which would assure him a single cell, because "given the totality of the circumstances, dangerous acting-out behavior appeared sufficiently likely that returning him to locked status seemed prudent, notwithstanding the overtly manipulative nature of his threats." (*Id*.) This pattern repeated itself several times, whenever Defendant was confronted with the need to share a cell. (*Id*.) During his time at the facility, Defendant received five disciplinary write-ups, including one for spitting on and threatening bodily harm to an officer. (*Id*. at 13-14.) Defendant was also "periodically argumentative, and sometimes appeared to be attempting to intimidate others (for example, when instructed by one of the nurses to stop using profanity in the hallway, he replied, 'Haven't you ever seen an agitated black man?')." (*Id*. at 5.)

In late September of 2007, Defendant began exhibiting behaviors that Dr. Wolfson

9

concluded were symptoms of legitimate mental health disorders. (*Id*. at 8.) Defendant complained about hearing "signals," having conversations with his mother's voice, hearing voices, including the voice of the Antichrist, and smelling hot metal. (*Id*. at 8-9) "He reported low mood, including passive suicidal ideation, though he had no specific desire, plan or intent to harm himself at that time." (*Id*. at 8.) Earlier, Defendant had informed Dr. Wolfson that in the past he had been voluntarily hospitalized after two suicide attempts: one by pill overdose, and the second by jumping in front of a car. (*Id*. at 3.) Defendant asked to be prescribed medication and described some of his medical history, which included diagnoses of bipolar affective disorder as well as information about an aunt who suffered from a psychotic illness. (*Id*. at 8.) Defendant began taking medication and periodically needed increases in the strength of the medication. (*Id*. at 9-10.) However, Defendant protested the mandatory mouth checks that accompanied prescribed medication because "when the nurses looked into his mouth, [Defendant felt] that the act had some kind of homosexual quality. He reported getting this feeling regardless of the gender of the particular nurse dispensing the medicine, and he appeared unaware that this term might appear odd when he was talking about an interaction with a female nurse." (*Id*. at 9.) By late April 2008, Dr. Wolfson concluded that Defendant had returned to his version of normal: "[E]ven as his overall appearance unequivocally was much better, the psychotic symptoms he reported began to regain their previous dramatic flavor, for example, plots to kill his family members that might be connected to the U.S. Marshals and prison staff in Philadelphia. He once again became headstrong during interviews, as he sought to bend them to whatever agenda he had [at] the moment." (*Id*. at 10.)

      In April of 2006, a psychology intern administered a psychological test to Defendant and

concluded:

> Mr. Jackson's evaluation results are characteristic of an individual who is feigning a mental illness. . . . It is important to note that these findings do not preclude the existence of a mental disorder. As such, he may in fact be experiencing true psychiatric symptoms, but he is presenting his problems in a manner that also includes the fabrication of additional symptoms and the exaggeration of experienced symptoms.

(*Id*. at 15.) Dr. Wolfson determined that, both before and after Defendant's period of valid mental illness, "[g]iven the overdramatized exposition of purported delusions which he shared only intermittently, plus unequivocal demonstration of dishonesty on psychological testing, over the spring and summer what we observed of him was consistent with character pathology in a high-stakes case rather than legitimate psychosis." (*Id*. at 7.) As to how Defendant's apparently-legitimate troubling behaviors, such as Defendant's irrational confrontation on the telephone with his attorney, affected this analysis, Dr. Wolfson stated: "I drew the conclusion that the defendant was not ill, though he was a remarkably challenging client for his counsel to have to work with . . . ." (*Id*.) Despite this conclusion, Dr. Wolfson conceded that "[t]rying to get the defendant's clinical presentation at our facility to make sense has been more burdensome then [sic] with most of the defendants we see." (*Id*. at 12.) Ultimately, Dr. Wolfson concluded, "the best explanation I can devise is that the defendant arrived faking, but eventually displayed legitimate illness. Once that illness responded to treatment, he resumed malingering, and also kept requesting more and more medication, despite the fact that his appearance and behavior now appeared much less consistent with true illness." (*Id*. at 12.) Dr. Wolfson qualified his opinions several times:

> This muddying of one's efforts to assess him may be legitimately characterized as reducing the degree of certainty with which I can draw clinical and forensic conclusions, at least compared to what is practical with most of our defendants. However, since it usually proves feasible to form such conclusions with a level of

> confidence well beyond what is typically needed for referring Courts' purposes, I believe that I can propose this formulation with what can still be legitimately expressed as reasonable medical certainty.

(*Id*. at 13.)  Defendant was discharged from the facility on a variety of medications that he took twice a day.  (*Id*. at 15.)  Dr. Wolfson diagnosed Defendant with "Psychosis, Not Otherwise Specified," but suggested that Defendant may suffer from schizophreniform disorder.  (*Id*. at 16.)  Dr. Wolfson also diagnosed Defendant with antisocial personality disorder.  (*Id*. at 17.)  Although Dr. Wolfson determined that "defendant's condition has improved sufficiently such that he no longer suffers from the active mental disease or defect that would be needed as a precondition for a lack of competence to stand trial or otherwise proceed with his case," Dr. Wolfson again qualified his opinion by stating that his conclusion "is certainly rendered with less confidence than is ordinarily feasible in this kind of endeavor."  (*Id*.)  He explained further: "Being prevented from forming firm conclusions is undesirable in any event, but particularly unfortunate in this case, as it might have resolved discomfort on the part of the Court and both counsels about how to view persistently irrational-seeming behavior when the defendant displays it, as he often has with his attorney."  (*Id*. at 18.)

       3.     *Dr. Atkins*

Dr. Atkins re-evaluated Defendant after receiving Dr. Wolfson's Report.  (*See* Donato Letter of Feb. 1, 2008.)  Dr. Atkins reviewed the Wolfson Report and documents written by Defendant, and met with Defendant at the FDC on February 28, 2008.  (Atkins Letter of Mar. 5, 2008 at 1.)  Dr. Atkins explained that although he disagrees with Dr. Wolfson's opinion that Defendant is competent, "[Dr. Wolfson's] January, 2008 report is consistent with my observations of Mr. Jackson at my most recent interview."  (*Id*.)  Dr. Atkins reported:

> Both Dr. Wolfson and I witnessed Mr. Jackson's florid psychotic thinking, including his reports of auditory hallucinations, paranoid ideation and the ingestion of his own excrement. His rambling diatribes regarding multifarious conspiracies were consistent with those that he had described throughout each of his prior examinations. Both the content and the presentation of Mr. Jackson's productions were clearly indicative of his ongoing, well entrenched Schizophrenic Disorder, Paranoid Type.

(*Id.*) Dr. Atkins described Defendant as "floridly psychotic at his interview with this clinician. He made little or no eye contact, and spoke in a tangential, rambling monotone. His hands were in constant motion – in a circular movement, and his legs were shaking throughout the interview." (*Id*. at 4.) During their interview, Defendant spoke to Dr. Atkins at length about, among other things: his medication and diagnoses; accusations that various clinicians were child molesters; receiving signals from satellites and computers; hearing voices in his left ear; how eating his own feces cures sexually-transmitted diseases; why he distrusts Defense counsel; smelling burning metal; and conspiracies against him involving the CIA, his mother, the government, and Defense counsel. (*Id*. at 4-6.) Defendant explained that his mother and the CIA are conspiring against him because "'I was in the Special Ops. I stabbed a couple of people.'" (*Id*. at 4.) Dr. Atkins concluded: "Based upon my review of Dr. Wolfson's recent report, and based upon my recent interview of Raymond Jackson, it is my opinion, with a reasonable degree of psychological certainty, that Raymond Jackson, because of his significant mental illness, is not capable of assisting in his defense and is, therefore, not competent to proceed." (*Id*. at 6.)

        4.     Dr. Boardman

Dr. Andrea Boardman, Ph.D., the chief psychologist at the FDC, provided the Court with a brief report on Defendant's adjustment to the FDC after his return from the Springfield, Missouri facility. When Defendant returned to the FDC, "he presented with mental health

concerns during the intake screening process in the Receiving and Discharge area. As a result of these concerns, he was placed on psychological observation status pending a formal psychological review." (Boardman Letter at 1.) Dr. Boardman explained: "Communication with the forensic evaluator at USMCFP Springfield suggested that inmate Jackson was initially malingering mental illness that subsequently developed a genuine psychiatric disorder. After he responded to treatment and the psychiatric disorder improved, inmate Jackson resumed malingering other symptoms of mental illness." (*Id*.) Dr. Boardman reported:

> His adjustment since his return to FDC Philadelphia was generally unremarkable until February 2008, when he reported experiencing homicidal or assaultive ideation. Since that time, he has reported auditory hallucinations but no aggressive impulses, plans or intentions. His affect is depressed and he has gained weight. Despite being encouraged to increase his activity level, inmate Jackson tends to sleep much of the time. Although his medication compliance is good, he does not participate in available treatment activities on the housing unit.
>
> On September 24, 2008, inmate Jackson was seen by the psychiatrist. He continues to report auditory hallucinations and indicates that he has taken "all kinds of medications" with poor efficacy but no side effects. Paranoid ideation was noted but suicidal and homicidal ideation were denied.

(*Id*. at 2.) Dr. Boardman did not present an opinion on Defendant's mental illness, stating that, based upon Dr. Wolfson's Forensic Report, it is difficult to determine whether Defendant is malingering and whether he is being truthful about his reported auditory hallucinations, but that "[j]udging from his affect and activity level, his reported depression appears to be credible." (*Id*.) However, Dr. Boardman reported that Defendant's behavior has been appropriate and that he requests mental health assistance as needed. (*Id*.)

        5.    *Dr. Atkins*

Defense counsel forwarded Dr. Boardman's letter to Dr. Atkins for his review. (*See*

Donato Letter of Oct. 7, 2008.)  In addition, Defense counsel reported that "[a]s recently as last week, I had a telephone conversation with Mr. Jackson which I can only describe as bizarre and consistent with the irrational conversations I have had with him over the past five years." (*Id*.)

Dr. Atkins found that

> [a]lthough Dr. Boardman's observations are consistent with what I observed at the time of my evaluations of Mr. Jackson, she questions the veracity of his reported auditory hallucinations.  In her letter, however, she offers no evidence of malingering and provides absolutely no foundation for such an allegation. . . .  If, in fact, Mr. Jackson were malingering the symptoms of his psychotic disorder, what purpose would that be serving?  He has already spent substantial time incarcerated.  And, if his complaints are self-serving, why would he have reported to his doctors (in February of this year) that he was experiencing *homicidal* and *assaultive* ideation?

(Atkins Letter of Oct. 6, 2008 (emphasis in the original).)

Dr. Atkins also re-evaluated Defendant on November 7, 2008, and concluded:

> There is no question in my mind that he remains incompetent to stand trial.  He continues to be delusional, he continues to have auditory hallucinations and he continues to maintain only the most tenuous grasp of reality.
>
> It is my opinion, with a reasonable degree of psychological certainty, that Raymond Jackson is not competent to stand trial and that he truly belongs in a psychiatric hospital.  He is not getting the treatment that he requires and, consequently, remains in a quasi-stuporous state believing that his thoughts are being monitored by the government via computer.  He claims that he spends almost all of his time in his room; he neither reads nor watches television; he had no idea that a new president had been elected; and, in spite of the fact that he believes that I am part of the government's conspiracy, he very much welcomed my visit, since "nobody else ever comes to see me . . . ."

(*See* Atkins Letter of Nov. 7, 2008.)

### B. Hearing

At the hearing held on November 26, 2008, Defense counsel argued that Defendant remained incompetent and would continue to remain incompetent. (Hr'g Tr. 4, Nov. 26, 2008.)

Counsel asserted:

> [I]t is our position that the Court should find and can find by clear and convincing evidence that the statutory requirements of 18 U.S.C. [§] 4246 all apply and that what should happen here is that Mr. Jackson should be found incompetent. The Government should dismiss the indictment, and he should be transferred to the custody of the Attorney [General] with instructions . . . for him to be committed by the Attorney General to a state hospital of a state in which he resides, either Pennsylvania or his original state of domicile, which was New York.

(*Id*. at 6-7.) Defense counsel emphasized Defendant's inability to cooperate with counsel, and noted that conversations with Defendant "ranged from difficult to very disturbing." (*Id*. at 7-8.) Defense counsel also explained for the record:

> I've spoken with Mr. Jackson about this disposition and his rights in connection with his subsequent hospitalization. I've informed him that he will be hospitalized according to whatever the protocol is in the state hospital and will not be released until the treatment in that state hospital decides that he can be released, and that I've informed him that after 180 days, if he believes that he should be released and the treatment team is not releasing him, and I've told him that I don't anticipate that they would . . . be releasing him within that time, then he would have a right to file a petition with whatever state mental health agency has jurisdiction over him for his release, and he would have the right to counsel to assist him and that he would need to request counsel from his treatment team, and they would make arrangements under whatever mental health procedures act apply to give him counsel. I've given him that information. I've explained to him that it would not be me.

(*Id*. at 12.) The Government concedes that the reports finding Defendant competent are ambiguous and that "there is substantial evidence that the defendant is not competent in that he is unable to cooperate with counsel." (*Id*. at 7.)

   **C.   Analysis**

Defendant has been in federal custody on these charges since April 24, 2003. We have attempted on a number of occasions to get this matter to trial. During the time that Defendant has been in federal custody he has spent a total of twenty months at the United States Medical

16

Center for Federal Prisoners at Springfield, Missouri. He has been evaluated by a number of psychologists and psychiatrists with mixed results. Defendant's conduct during court proceedings has ranged from placid to difficult to bizarre.

Based upon the record that is presently before the Court, we are compelled to conclude that Defendant suffers from a mental disease or defect that renders him incompetent to stand trial. We agree with Dr. Atkins that Defendant is not competent to stand trial and that he should be hospitalized in a mental health facility. We reject the idea that Defendant is simply feigning mental illness. Although Dr. Wolfson has raised some question with regards to the legitimacy of Defendant's psychosis, he has done so in a cautiously-worded, highly-qualified statement of opinion. Moreover, many of the observations of both Dr. Wolfson and Dr. Boardman are entirely consistent with Dr. Atkins' observations, as well as with his conclusions about Defendant's diagnosis. Perhaps most significant is the fact that there appears to be no dispute among the experts that Defendant is legitimately incapable of cooperating with counsel.

In addition, we conclude based upon clear and convincing evidence that Defendant's release would create a substantial risk of bodily injury to another person or serious damage to property of another. Defendant is also a serious danger to himself. Dr. Atkins advises that hospitalization is the best course for Defendant, who is not responding to treatment, and is not receiving the treatment that he needs, in the FDC. Defendant reports auditory hallucinations, including hearing the voices of his mother, the Antichrist, a woman named Inga, and various signals from satellites and computers. In addition, Defendant reports olfactory hallucinations, having told both Dr. Wolfson and Dr. Atkins that he smells burnt metal. Defendant has taken significant medication with only partial success. He has a history of noncompliance with

medication.

As recently as February 2008, Defendant reported homicidal or assaultive ideation. Defendant spat on and threatened bodily harm to an officer while at the facility in Springfield, Missouri, and he received disciplinary write-ups for several other incidents. During earlier confinements, Defendant threatened staff members, yelled, and appeared highly agitated. Defendant has demonstrated that he becomes threatening and potentially violent when he is faced with a situation that displeases him. For example, the potential of sharing a cell at the Springfield mental facility triggered "dangerous acting-out behavior" by Defendant. Defendant has a consistent history of being unable to control his temper when people upset him and of becoming unrealistically upset and acting out when he feels slighted by anyone. Defendant has shown that he erupts when confronted with stress or displeasing events. Combined with Defendant's argumentative, strong-willed personality, his hallucinations and his conspiracy theories, as well as Defendant's history of noncompliance with medication and poor response to large doses of medication when taken, Defendant's past expressions of violence suggest a significant risk of future violent behavior if he were to be released.

## IV.   CONCLUSION

Having found that Defendant is incompetent to stand trial and that his release would create a substantial risk of bodily injury to another person or himself, we commit Defendant to the custody of the Attorney General for release to the appropriate state official or to hospitalize Defendant pursuant to 18 U.S.C. § 4246(d) for treatment in a suitable facility. Counts One, Seven, and Eight of the Indictment are dismissed as to Defendant Raymond Jackson.

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | NO. 03-173-04 |
| RAYMOND JACKSON | : | |

**<u>ORDER</u>**

AND NOW, this <u>16th</u> day of March, 2009, upon consideration of reports submitted by psychologists and psychiatrists who have evaluated Defendant Raymond Jackson, and after a hearing in open court with Defendant and counsel present, it is ORDERED as follows:

1. Defendant is not competent to stand trial;

2. Counts One, Seven, and Eight of the Indictment are dismissed as to Defendant;

3. Pursuant to 18 U.S.C. § 4246(d), we find by clear and convincing evidence that Defendant is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another, and therefore Defendant shall be committed to the custody of the Attorney General; and

4. Pursuant to 18 U.S.C. § 4246(d), the Attorney General shall release Defendant to the appropriate official of the State in which Defendant is domiciled if such State will assume responsibility for his custody, care, and treatment. The Attorney

General shall make all reasonable efforts to cause such State to assume such responsibility.

IT IS SO ORDERED.

BY THE COURT:

/s/ *R. Barclay Surrick*
U.S. District Judge